**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**
**CASE NO. 5:10-CV-00062-RLV-DSC**

| | | |
|---|---|---|
| ELECTRICAL WORKERS PENSION | ) | |
| TRUST FUND OF IBEW LOCAL UNION | ) | |
| NO. 58, Individually and on Behalf of All | ) | |
| Others Similarly Situated, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND ORDER** |
| | ) | |
| COMMSCOPE, INC., FRANK M. | ) | |
| DRENDEL, JERALD L. LEONHARDT, and | ) | |
| BRIAN GARRETT, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**THIS MATTER** is before the Court on Defendants' Motion to Dismiss the Amended

Complaint filed on behalf of a class of undetermined number consisting of all common-stock

shareholders of CommScope, Inc.[1] (Doc. 29.) After careful consideration of the parties' filings,

and for the reasons set forth below, Defendants' Motion will be granted.

## I. FACTUAL AND PROCEDURAL HISTORY

CommScope is a Hickory, North Carolina-based company specializing in infrastructure

solutions for communication networks. During the relevant class period, CommScope was a

publicly held company with common stock listed on the New York Stock Exchange. The

company's business niches, in addition to communication-network-infrastructure solutions,

include the manufacturing of coaxial cable for broadband-cable-television networks and the sale

---

[1] The appointed lead plaintiff for the class is New York Teamsters Conference and
Retirement Fund. (Doc. 21.)

and distribution of environmentally secure cabinets for digital-subscriber-line, fiber-to-the-node, and wireless applications. CommScope employs in excess of 10,000 workers and maintains a presence in more than 130 countries. Having grown through the acquisition of various smaller companies, CommScope divided itself into four reportable segments in 2007: (1) the Antenna, Cable and Cabinet Group ("ACCG"); (2) Enterprise; (3) Broadband; and (4) Wireless Network Solutions ("WNS").

The Enterprise segment ("Enterprise") was the company's largest segment in 2007 but became the second-largest segment in 2008 due to a particularly large acquisition in the ACCG segment. Enterprise accounted for approximately twenty-two percent of the company's net revenues in 2008. (Doc. 26 at 9.) By that time, Enterprise had a dedicated sales team of approximately 400 individuals who targeted businesses faced with a "growing need for higher bandwidth connectivity solutions." (Doc. 26 at 11.) Notably, Enterprise was coming off somewhat of a landmark year in 2007, having increased the segment's net sales almost $100 million, jumping from total net sales of $802.3 million in 2006 to $899.4 million in 2007. (Doc. 26 at 12.) As a result of the Enterprise's success from 2007—and only according to confidential witnesses as reported in the Complaint—the company, guided by the individual defendants,[2] allegedly instituted an aggressive internal sales budget for 2008.

The sales budgets were originally formulated using sales forecasts predicated on the individual Enterprise sales representatives' recommendations and predictions for the coming year. According to Plaintiff's confidential witnesses, however, Defendant Drendel revised the representatives' forecasts and instituted a "top down" mandate to increase drastically the

---

[2]    By corporate position, the individual defendants are Frank Drendel, the Chairman and Chief Executive Officer of CommScope, Jearld L. Leonhardt, its Executive Vice President and Chief Financial Officer, and Brian Garrett, the company's former President and Chief Operating Officer.

forecasts, and correspondingly the sales budgets, for the year 2008. This process occurred in stages over the time period beginning in September 2007 and ending December 31, 2007. The result was, as one of Plaintiff's confidential witnesses claimed, an unattainable sales growth prediction of "15 to 24 percent above the actual 2007 sales for 2008" for the North American Enterprise segment. (Doc. 26 at 15–16.)

According to Plaintiff, as Enterprise began reporting its 2008 results, the "unattainability" of the top-down, mandated sales budgets proved true. Confidential witnesses said the majority of the North American Enterprise territories were "at 70 percent of plan or below" by the end of the first quarter of 2008. (Doc. 26 at 16.) Moreover, Plaintiff alleges that, through the first two months of 2008, Enterprise customers discarded a number of projects that were in the project pipeline and a number of projects were delayed, and, specifically in the Georgia sales territory, that major projects from 2007 worth $6–7 million were completed, yet the budget accounted for repeated business at the same level. (Doc. 26 at 17–18.) In other words, the positive results of 2007 seemed to be a result of a confluence of events that would not be repeated in 2008.

As alleged in further confidential witness testimony, "it was apparent—based on sales reports and . . . monthly sales conference calls—that the company would not replicate the North American Enterprise sales from 2007, let alone attain the growth forecasts for 2008." (Doc. 26 at 20.) While most of the witness testimony alluded to poor performance in the North American region only, one witness did report that Enterprise sales "slowed dramatically" in other regions such as "South America, Asia Pacific and North America," yet no concrete examples are proffered. (Doc. 26 at 19.)

Simultaneously with the alleged "sales slow-down," the company implemented Enterprise price increases of fifteen percent throughout the months of April, June, and August

2008. (Doc. 26 at 20.) It is undisputed that the price increases were due almost entirely to the rising costs of raw materials and increased freight charges. *Id.* CommScope's competitors, however, did not increase prices until a few months after CommScope and, as a result, CommScope experienced a "significant amount of push-back" from its customers. Confidential witness testimony states that as a direct result of the price increase, some of the company's customers were "looking elsewhere" for their enterprise product needs. (Doc. 26 at 21.) As an example, the witness alleges that Anixter, a Los Angeles metro-area customer, began 2008 buying "roughly 667 thousand foot reels of cable on a monthly basis . . . when the price was at $150" for a reel; yet, by mid-2008, when the price was $200 per reel, "Anixter was only purchasing 500" reels per month. (Doc. 26 at 21–22.) By Plaintiff's own estimation, however, this difference in actual sales equates to a mere $50 per month or roughly a 0.05% reduction.

Each sale was reported in the company's internal tracking, SAP system. Furthermore, the sales representatives continually updated the project pipeline, pending projects, and prospective failures in the company's "Miller Heiman" system. The individual defendants all had access to these various systems and could have viewed up-to-date sales projections at anytime. (Doc. 26 at 22–23.)

On April 29, 2008, CommScope issued a press release in which it projected full-year revenues of $4.1 to $4.3 billion and an "8–10%" annual sales growth in Enterprise. (Doc. 26 at 23.) The same press release stated that the company "remain[ed] excited about the opportunities ahead," that "North American Enterprise Sales were . . . unchanged," and that "Enterprise . . . grew primarily due to sales growth in other regions." (Doc. 26 at 28.) Additionally, the company predicted second-quarter revenues of $1.05 to $1.09 billion; stated it had "a strong global

portfolio and continue[d] to expect ongoing global demand for bandwidth to drive the need for infrastructure solutions"; and "look[ed] forward to another successful year." (Doc. 26 at 28–29.)

That same day, the individual defendants hosted a conference call with securities analysts. (Doc. 26 at 29.) The call remained largely positive, and these defendants made a number of optimistic statements regarding the global health of the company: "We . . . continue to see a solid global project pipeline that keeps us optimistic"; "There is an attractive rate of new projects coming into the pipeline"; "Enterprise . . . continues to experience profitable year-over-year growth"; and " . . . [T]here's nothing in the first quarter that would substantially change our outlook." (Doc. 26 at 29–35.)

After the press release and conference call of April 29, CommScope's stock rose $5.94 on April 30, more than tripling in trade volume from the previous day. (Doc. 26 at 34.) On May 7, 2008, CommScope filed its quarterly report with the Securities and Exchange Commission, and the stock continued to rise by less than a dollar per day for the next few days. *Id.* Over the period between the press release and the company's SEC filing, Defendant Garrett sold 45,775 shares of company stock for over $2.2 million. (Doc. 26 at 24–25.) On June 16, 2008, Defendant Drendel sold 30, 867 shares for over $1.7 million; on July 15, he sold 20,000 shares for $962,200; on July 17, he sold 9,384 for $479,335; and on July 23, he sold 4,692 shares for $253,368. (Doc. 26 at 24.) All sales, however, were executed as part of a pre-established stock-trading plan executed pursuant to SEC Rule 10b5-1 and filed with the Commission. (Doc. 29-1 at 12–13); 17 C.F.R. § 240.10b5-1.

On July 29, 2008, after the market closed for the day, CommScope issued a press release entitled "CommScope Announces Second Quarter 2008 Results." (Doc. 26 at 38.) Therein, CommScope announced that it had met its sales guidance from the first quarter and that it had

tightened its prediction for the year's total guidance from $4.1–4.3 billion to $4.15–4.25 billion. (Doc. 26 at 39–40.) The press release also announced third-quarter revenue expectations of $1.08–1.13 billion and acknowledged a "challenging North American market." *Id.*

The company hosted, that same day, another conference call with securities analysts in which the individual defendants joined. (Doc. 26 at 41.) On this call, the individual defendants made a number of statements, including, *inter alia*: "Despite a challenging North American market and tough year-over-year comparisons . . . , we delivered solid enterprise results"; "[E]conomic conditions and rising raw material costs remain a concern"; "[W]e believe that the ongoing, global demand . . . should continue to provide attractive opportunities for earnings growth"; "[W]e have seen a year-over-year slowdown in domestic spending"; "[T]he success of the price increases we announced . . . largely have gone well"; "[A]ctivity in terms of projects are not slowing down in the enterprise space, they are expanding"; "[I]n light of what looks like adversity, in the North American market[, t]he long term picture for [Enterprise] continues to be robust"; "[The growth rate of Enterprise is] something in the neighborhood of 5% in North America"; and "I would take argument about your assessment of the, particularly the North American market, slowing over the course of the quarter." (Doc. 26 at 41–46.)

On July 30, 2008, the company's stock price fell $4.74 to $46.06 per share from the previous day's close of $50.80. On August 6, 2008, the company filed its quarterly report with the SEC for the second quarter, confirming the financial results announced in the July 29, 2008, press release. On August 7, CommScope share prices fell to $44.70 per share. (Doc. 26 at 47.) Meanwhile, each individual defendant continued to sell company stock throughout this time period, despite the price drop, until late August and early September. (Doc. 26 at 23–24.)

On October 30, 2008, after the market closed for the day, CommScope reported its third quarter earnings as $1.06 billion, down from the previously announced, expected revenues of $1.08–1.13 billion. (Doc. 26 at 49.) The company also lowered its full-year revenue guidance from $4.15–4.25 billion to a lower range of $4.03–4.08 billion. *Id.* The company also announced an Enterprise sales decrease of 1.6 percent on a year-over-year basis. *Id.* On October 31, 2008, the company's stock price dropped to $14.71 per share, down from $20.19 the day before. (Doc. 26 at 51.) The trading volume on October 31 was over five times the volume of the previous day. *Id.*

On May 12, 2010, Electrical Workers Pension Trust Fund of IBEW Local Union No. 58 filed the Complaint on behalf of a class comprised of all CommScope shareholders—exclusive of the individual defendants and their relations—against Defendants, alleging violations of sections 10(b) and 20(b) of the Securities Exchange Act of 1934. (*See generally* Doc. 1.) On October 29, 2010, after its appointment as Lead Plaintiff, the New York States Teamsters Conference Pension and Retirement Fund filed its Amended Complaint, both individually and on behalf of the class. (Docs. 21, 26.)

In the Amended Complaint, Plaintiff alleges that Defendant CommScope violated section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(a) & t(a), and corresponding Rule 10b–5, 17 C.F.R. § 240.10b–5, by fraudulently misrepresenting the company's financial outlook during the class period of April 29, 2008, to October 30, 2008. (Doc. 26 at 1.) Plaintiff also alleges that, pursuant to section 20(a) of the Exchange Act, the individual defendants are liable for the fraudulent actions of CommScope as "controlling persons" of the company who artificially inflated the company's stock price to affect personal financial gain. (Doc. 26 at 67.)

On December 23, 2010, Defendants moved to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), as well as the Private Securities Litigation Reform Act of 1995 ("PSLRA" or "Reform Act"), Pub. L. No 104-67, 109 Stat. 737 (1995) (codified as amended in scattered sections at 15 U.S.C. §§ 77z–1, 77z–2, 78j–1, 78u–4, 78u–5). (Doc. 29.)

## II. STANDARD OF REVIEW

Generally, a motion filed pursuant to the Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of a complaint, *Jordan v. Alternatives Res. Corp.*, 458 F.3d 332, 338 (4th Cir. 2006), measured by whether it meets the standards stated in Rule 8 (providing general rules of pleading), Rule 9 (providing rules for pleading special matters), Rule 10 (specifying pleading form), Rule 11 (requiring the signing of pleading and stating its significance), and Rule 12(b)(6) (requiring that a complaint state a claim upon which relief can be granted), *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). In the instant case, one of the "special matters" to which Rule 9(b) refers is implicated in the Amended Complaint: fraud. Fed. R. Civ. P. 9(b). Specifically, in pleading fraud, Plaintiff must "state with particularity the circumstances constituting fraud . . . . Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.*

The purpose of such a heightened pleading standard is to ensure adherence to the basic policy that "unfounded fraud claims should be identified and disposed of early." *Teacher's Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 171 (4th Cir. 2007) (quoting 5A Charles A. Wright & Hunter M. Miller, *Federal Practice and Procedure* § 1296 (3d ed. 2004)). Over time, Congress has viewed securities fraud to be a particularly egregious class of cases fraught with, what have been perceived to be, "unfounded" claims. *See* H.R. Rep. No. 104-369, at 31 (1995), *reprinted in* 1995

U.S.C.C.A.N. 730, 730 ("The private securities litigation system is too important to the integrity of American capital markets to allow this system to be undermined by those who seek to line their own pockets by bringing abusive and meritless claims.").

In response, Congress passed the Private Securities Litigation Reform Act, which established even stricter pleading standards. *See* H.R. Rep. No. 104-369, at 41 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 740 ("[Rule 9(b)] has not prevented abuse of the securities laws by private litigants . . . . [There is a] need to establish uniform and more stringent pleading requirements to curtail the filing of meritless lawsuits."). The PSLRA explicitly elevates a plaintiff's pleading standard in a private securities lawsuit, establishing two specific hurdles to surmount: (1) "the complaint shall specify each statement alleged to have been misleading, the reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed"; and (2) "the complaint shall, with respect to each act or omission alleged . . . , state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1)(B), (2)(A).

The application of this heightened pleading standard was addressed by the Supreme Court in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007). First, a 12(b)(6) motion demands that the court accept all factual allegations in the complaint as true. *Id.* at 322. Second, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id.* The Supreme Court has emphasized that individual allegations, "scrutinized in isolation," are not sufficient to carry a 12(b)(6) motion. *Id.* at 323 (referencing *Abrams v. Baker*

*Hughes Inc.*, 292 F.3d 424, 431 (5th Cir. 2002)). Third, "in determining whether pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Id.* at 323. "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

## III. DISCUSSION AND ANALYSIS

Plaintiff alleges that CommScope has violated section 10(b) of the Exchange Act and Rule 10b5-1, and that the individual defendants have violated section 20(a) of the Exchange Act. (*See* Doc. 26 ¶¶ 140–55.) Essentially, Plaintiff alleges that Defendants (1) knowingly or recklessly made false and misleading statements regarding the company's projected financial results for the second and third quarters of 2008, (2) failed to disclose the truth about the current status of the Enterprise segment of the company, and (3) used such statements to artificially inflate the company's stock price so that the individual defendants could sell their stock for personal financial gain. (*See generally* Doc. 26.)

Defendants have responded with a general denial of all allegations levied against them. (*See generally* Doc. 29-1.) Specifically, Defendants maintain that (1) SEC Rule 10b5-1 precludes the Court from considering the individual defendants' sales of stock as evidence of scienter because the sales were made pursuant to a pre-existing stock-sale plan; (2) all allegedly false or misleading statements are protected from fraudulent liability on the basis of the Reform Act's "safe harbor" for forward-looking statements; (3) the forward-looking statements were accompanied by meaningfully cautionary language; (4) many of the forward-looking statements are immaterial and thus inactionable as a matter of law; (5) if any forward-looking statements were false or misleading, Plaintiff failed to plead with particularity that Defendants had actual

knowledge of any falsity; (6) if any of the statements were not forward-looking, Plaintiff still failed to plead, with the requisite particularity of fact under the PSLRA, that the statements were false; (7) Plaintiff failed to plead facts suggestive of a strong inference of scienter on behalf of the Defendants, as required by the PSLRA; (8) Plaintiff fails to establish a causal connection between the alleged material misrepresentations and the actual alleged loss; and (9) Plaintiff's section 20(a) cause of action is invalid because it is derivative of its section 10(b) cause of action, which the individual defendants maintain, for the aforementioned reasons, must necessarily fail. *Id.*

A. Stock Sales Under SEC Rule 10b5-1

Plaintiff maintains that "the Individual Defendants' [s]tock [s]ales [s]upport a [s]trong [i]nference of [s]cienter." (Doc. 32 at 34.) Defendants respond that the stocks were sold pursuant to a predetermined stock trading plan and that, after execution of the plan, the individual defendants had no input or involvement with how the stocks were sold. (Doc. 29-1.) As such, Defendants maintain that SEC Rule 10b5-1 expressly recognizes the legitimacy of the plan and negates any inference of scienter on behalf of CommScope or its "controlling persons." *Id.* This is an important preliminary issue to resolve because it has ramifications on what evidence is to be used when evaluating the general and individual elements of Plaintiff's broader section 10(b) and section 20(a) claims.

Plaintiff cites to *Lefkoe v. Jos. A. Bank Clothiers*, No. 06-1892, 2008 WL 7275126, at *6 (D. Md. May 13, 2008), for the proposition that "this Court may take judicial notice of the fact that [the individual defendants] entered into a 10b5-1 plan, because that information is available from public SEC filings," but that "the Court may not consider the substance" of the plan because the plan itself was not before the Court on the pleadings. In other words, "[r]aising the

affirmative defense of trading under a 10b5-1 trading . . . is . . . premature in a motion to dismiss," *id.* at *9, because the defense requires "an additional factual finding of good faith," *In re Able Labs. Sec. Litig.*, No. 05–2681, 2008 WL 1967509, at *27 n.40 (D.N.J. Mar. 24, 2008); *see also* 17 C.F.R. § 240.10b5-1(c)(1)(ii) ("[The affirmative defense of following an adopted written plan] is applicable only when the contract, instruction, or plan to purchase or sell securities was given or entered into in good faith and not as a plan or scheme to evade the prohibitions of this section."). Because the SEC rule clearly requires a showing of good faith, *id.*, and because a showing of good faith would require additional evidence to be presented by Defendants, this Court finds that it cannot, as a matter of law, find that Defendants' filings of 10b5-1 plans automatically negate an inference of scienter as a matter of law. Should the case proceed beyond the instant Motion, pre-trial discovery may resolve that issue, but for the time being it is left open.

Therefore, and for the purposes of the Court's resolution of the instant Motion, "[s]ales of stock by corporate insiders *can* suffice to establish scienter *if the trades were unusual in their timing or amount.*" *Tellabs*, 551 U.S. at 325 (emphasis added). That is not to say that the stock sales do support an inference of scienter—much less a "strong" inference—but that they may be added to the mix for consideration. *See In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 644 (E.D. Va. 2000) ("[T]he determination of whether insider sales were 'suspicious' is *highly context-specific and dependent on the other allegations in the complaint.*" (emphasis added)).

For the stated reasons, this Court will not accept at this time Defendants' absolute defense that SEC Rule 10b5-1 insulates their trades from an adverse inference. Instead, because the stock sales are included in the pleading, the Court will consider them as one of many factors that may support a plausible inference of scienter.

B.  PSLRA Safe Harbor for Forward-Looking Statements

The Reform Act provides the following safe harbor, meant to insulate corporate entities and representatives from liability for fraud on the grounds of false or misleading representations in certain forward-looking statements:

(1)    In general

Except as provided in subsection (b) of this section, in any private action arising under this chapter that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a person referred to in subsection (a) of this section shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that—

(A) the forward-looking statement is—

(i)  identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
(ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement—

(i)  if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or
(ii) if made by a business entity; was—

(I)  made by or with approval of an executive officer of that entity; and
(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u-5(c). Defendants' Motion and supporting brief assert that all of their allegedly misleading statements fall within this safe-harbor provision. Specifically, they claim that all relevant statements were (1) "forward-looking"; (2) accompanied by meaningful cautionary language; (3) immaterial; and, insofar as the particularly pleaded facts indicate, (4) made without any actual knowledge of falsity on behalf of the Defendants. (Doc. 29-1 at 2.) Because a

qualifying forward-looking statement cannot be actionable for fraud as a matter of law in the first place, the Court deems it necessary to determine which statements do in fact qualify for safe-harbor protection before proceeding to a more detailed analysis of the specific elements of a fraud claim. Therefore, each allegedly fraudulent statement, as stated in the Complaint, will now be considered below for PSLRA protection as a forward-looking statement.

1. Forward-Looking Statements Made by Defendant

Defendant maintains that each and every challenged statement included in the Amended Complaint is a forward-looking statement. (Doc. 29-1 at 21) ("[T]he statements challenged by Plaintiff qualify as forward-looking statements under the Reform Act's safe harbor."). While the Plaintiff acknowledges that some of the statements are forward-looking, it does not believe that all of the challenged statements qualify for the safe harbor. (Doc. 32) ("Defendants appear to suggest that every single misstatement identified in the Complaint is forward-looking. *Not true*." (internal citations omitted)). Specifically, Plaintiff alleges that any statements about historical or present fact, or even mixed present and future statements of fact, are not protected by the safe harbor.

In this regard, Plaintiff is correct. "[A]ny statements of present or historical fact do not [fall within the statutory safe harbor]." *In re Smith & Wesson Holding Corp. Sec. Litig.*, 604 F. Supp. 2d 332, 341 (D. Mass. 2009); *see also Makor Issues & Rights Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) (hereinafter *Tellabs II*) ("[A] mixed present/future statement is not entitled to the safe harbor *with respect to the part of the statement that refers to the present*." (emphasis added)). The preliminary issue, then, is to determine which of the challenged statements are forward-looking. To do so, the Court will first evaluate the statements for their

temporal import against the backdrop of the Reform Act's definition of a forward-looking

statement:

> The term "forward-looking statement" means—
>
> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
> (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;
> (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);
> (E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or
> (F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

15 U.S.C. § 78u-5(i)(1).

Those statements that are deemed forward-looking must be subjected to an analysis

consistent with the rubric of the PSLRA's safe harbor. 15 U.S.C. § 78u-5(c). This analysis, in

turn, must determine whether the identified forward-looking statement is either (1) accompanied

by meaningful cautionary language, (2) immaterial, or (3) not proven with particularity of fact to

have been uttered with actual knowledge of falsity. 15 U.S.C. § 78u-5(c). If any of these

elements is found, then the statement is inactionable as section 78u-5(c) clearly and undeniably

creates a disjunctive set of elements in which only one must be satisfied to relieve the defendant

of liability. *Id.*

Therefore, if the forward-looking statement is accompanied by meaningful cautionary

language, then the statement is inactionable and no further analysis is need. *See, e.g.*, *In re*

*Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010) ("[T]he investors argue for a conjunctive

reading of the safe harbor provision, under which a sufficiently strong inference of actual knowledge would overcome meaningful cautionary language. . . . [T]hat ignores the plain language of the statute, which is written in the disjunctive."). If the forward-looking statement is not accompanied by meaningful cautionary language, but is deemed immaterial, then the statement is inactionable and no further analysis is needed. *Id.* Even if the forward-looking statement is not accompanied by meaningful cautionary and deemed material, if the claim does not state facts sufficient to demonstrate actual knowledge on behalf of the Defendants, the statement is still inactionable. *Id.*

Plaintiff has identified upwards of thirty-five alleged misstatements, which the Court shall now address.

*(a) CommScope's press releases containing guidance figures and revenue projections.*

There is no doubt that all of the challenged statements of revenue guidance or anticipated earnings do qualify as forward-looking pursuant to section 78u-5(i)(1)(A) above. Therefore the Quarterly Report and "Outlook" press-release statements challenged in the Amended Complaint at paragraphs seventy-three and eighty-five qualify as forward-looking, and thus also for potential safe harbor protection. (Doc. 26 ¶¶ 73, 85); *see Marsh Group v. Prime Retail, Inc.*, 46 F. App'x 140, 146 (4th Cir. 2002) ("The statements are forward-looking because they relate to future economic performance." (quotations and citation omitted)).

Having established that the "Outlook" statements are forward-looking statements, the Court must determine whether the statements were accompanied by meaningful cautionary language. As previously stated, if so, the statements are under PSLRA safe harbor protection and are thus inactionable. *See* discussion *supra* Part III.B(i). Interestingly, while Plaintiff identified the allegedly misleading representations contained in both the April 29, 2008, and July 29, 2008,

"Outlook" press releases in bold italics in the Complaint (Doc. 26 ¶¶ 73, 85), the following

language from the press releases was not mentioned:

> This press release contains forward-looking statements regarding, among other things, . . . business position, plans, outlook, . . . and other financial items . . . that are based on information currently available to management, management's beliefs and a number of assumptions concerning future events. Statements made in the future tense, and statements using words such as "intend," "goal," "estimate," "expect," "project," "projections," "plans," "anticipate," "should," "foreseeable future," "believe," "confident," "think," "scheduled," "outlook," "guidance," and similar expressions are intended to identify forward-looking statements. Forward-looking statements are not a guarantee of performance and are subject to a number of risks and uncertainties, . . . includ[ing], but [] not limited to, continued economic weakness and uncertainties; . . . customer demand for our products . . . ; competitive pricing and acceptance of products; industry competition . . . : changes in cost and availability of key raw materials and the ability to recover these costs from customers through pricing actions; . . . the risk that customers might cancel orders placed or that orders currently placed may affect levels in the future; . . . the ability to achieve expected sales growth and earnings goals . . . . For a more complete description of factors that could cause such a difference, please see CommScope's filings with the Securities and Exchange Commission (SEC) . . .

(Doc. 29–10 at 1).

In its opposition brief, Plaintiff contends that such language is "vague and boilerplate"

and that it is not "detailed and meaningful cautionary language tailored to the specific risks the

company faces." (Doc. 32 at 22) (quoting *In re Constellation Energy*, *Inc. Sec. Litig.*, 738

F.Supp. 2d 614, 625 (D. Md. 2010)). Plaintiff goes on to say that the list is a "laundry list" and

thus not meaningful because the risks identified could "apply to any company at any time."

(Doc. 32 at 22.) This argument falls short.

Plaintiff interestingly contradicts itself in arguing both sides of the coin. In addition to the

argument that CommScope cautions against risks that are too broad to be "tailored" to the

company itself, Plaintiff also argues that CommScope cautioned against the particular risks it

knew were coming, and were thus essentially guilty of hedging its risk against a predetermined

fall: "[R]isk warnings are insufficient where they provide[] no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." (Doc. 32 at 22) (quoting *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004)). In other words, Plaintiff argues that Defendants' cautionary language was at the same time both not tailored enough and suspiciously too tailored.

Setting this contradiction aside, the Court turns to a plain reading of both the statute and the legislators' drafting materials. Such reading reveals that all Defendant need do is provide meaningful, cautionary language—nothing less, nothing more. First, as already established, the statute's language is clear that all that must accompany a forward-looking statement to qualify for safe harbor protection are "important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(A)(i). Here, Plaintiff claims the statements were misleading because they did not reveal extant risks of slowing "customer demand in [Enterprise] products," "the risk that customers might cancel orders," and the "acceptance of products" in the face of "competitive pricing" changes—*all statements that were specifically mentioned in Defendants' cautionary language*. (Doc. 29–10 at 1.) Thus, the Defendant sufficiently tailored the risks to its own situation because the very risks to which it has alluded are those that Plaintiff alleges occurred or were likely to occur according to the alleged knowledge held by Defendants.

Plaintiff, however, maintains that this is not enough, claiming that (1) "if Defendants knew that the specific risks and uncertainties stated to be 'potential' in their cautionary language had already been realized, . . . then their forward-looking statements are not protected by the safe harbor," (Doc. 32 at 22) (quoting *In re Nash Finch Co. Sec. Litig.*, 502 F. Supp. 2d 861, 873 (D. Minn. 2007)), and (2) "the adequacy of cautionary language is a question of fact . . . not a

question to be resolved on a motion to dismiss," (Doc. 32 at 14–15) (quoting *Lefkoe*, 2008 WL 7275126, at *21–22). As to the first assertion, Plaintiff rests its argument on a minority position from a district court. *See W. Wash. Laborers-Emp'rs Pension Trust v. Panera Bread Co.*, 697 F. Supp. 2d 1081, 1089 (E.D. Mo. 2010) (recognizing that the majority of courts read section 78u-5(c)(1)(A) to apply "irrespective of the speaker's mind" and explicitly declining to follow the minority view in *In re Nash*). Instead, this Court sides with both the majority of courts in maintaining the disjunctive reading of the stature, *id.*, noting the legislative intent of those that created it: "[C]ourts should not examine the state of mind of the person making the statement." H.R. Rep. 104-369, at 44 (1995), reprinted in U.S.C.C.A.N. 730, 743.

As to the second assertion of Plaintiff—that the adequacy of cautionary language is a question of fact not to be resolved on a motion to dismiss—this Court must disagree. First, Plaintiff relies on *Lefkoe* for this proposition, which itself relied on *Blatt v. Corn Products Inter., Inc.*, No. 05-3033, 2006 WL 1697013, at *5 (N.D. Ill. June 14, 2006). The court in *Blatt*, however, did not have that issue before it. *Id.* ("Defendants do not ask me to decide whether their statements were sufficiently cautionary."). This Court, instead, once again finds informative the plain language of the statute: "On *any motion to dismiss* based upon subsection (c)(1) of this section, *the court shall consider* any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement . . . ." 15 U.S.C. § 78u-5(e) (emphasis added). Moreover, this Court hardly stands alone in deciding the adequacy of cautionary language on a motion to dismiss. *See, e.g., Halperin v. eBanker USA COM, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002) ("[T]he *key question a district court must decide* when determining whether to grant a motion to dismiss a securities fraud complaint is *whether plaintiffs have overcome the existence of such [cautionary] language*." (emphasis added)); *Karacand v. Edwards*, 53 F. Supp.

2d 1236, 1243 (D. Utah 1999) ("Courts must determine, at the pleading stage, whether a company's forward-looking statements fall within the safe harbor."); *Ehlert v. Singer*, 245 F.3d 1313, 1320 (11th Cir. 2001) ("[Because] adequate cautionary language accompanies the forward-looking statement, we hold that Defendants are protected from liability under the safe[ ]harbor.").

Because this Court must not consider the state of mind of Defendants at the time the cautionary language was made, and because this Court very well may decide the issue of the cautionary language's adequacy at this stage of the litigation, the Court finds that the tailored language in Defendants' press releases, which detailed the exact risks that Plaintiff complains were not addressed, qualify as meaningful, cautionary language. Thus, all forward-looking financial statements in the press releases are subject to the safe-harbor provision of the Reform Act and are correspondingly insulated from liability.

*(b) CommScope's conference calls with securities analysts.*

Plaintiff also alleges that various statements made during the April 29, 2008, and July 29, 2008, conference calls with securities analysts contained misleading, fraudulent statements. In reciting those statements in the Complaint, similar to its omission regarding the press release, *see* discussion *supra* Part III.B(i)(a), Plaintiff did not acknowledge the following cautionary language recited at the beginning of each conference call:

> During the conference call today, we may make forward-looking statements regarding our financial positions, plans, . . . and outlook that are based on information currently available to management, management's beliefs and a number of assumptions concerning future events. Forward-looking statements are not a guarantee of performance and are subject to a number of uncertainties and other factors, which could cause the actual results to differ materially from those currently expected. For a more detailed description of factors that could cause such a difference, please see the press release we issued today and CommScope's filings with the Securities and Exchange Commission.

(Doc. 29–10 at 2). If the above statement were, by itself, not enough, the referenced press release qualifies as meaningful cautionary language, as already established. Cautionary language by reference to another document has long been held to be adequate, and this Court finds no reason to deviate from that principle. *See, e.g.*, *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 282 (3d Cir. 2010) ("Cautionary statements disclosed in SEC filings may be incorporated by reference; they 'do not have to be in the same document as the forward-looking statements.'" (internal citations omitted)); *see also Emp'rs Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1133 (9th Cir. 2004) ("[The] PSLRA does not require that the cautions physically accompany oral statements."); *In re Humphrey Hospitatilty Trust, Inc. Sec. Litig.*, 219 F. Supp. 2d 675, 684 (D. Md. 2002) (same).

Therefore, this Court finds that any forward-looking statement made by Defendants in the two complained-of conference calls are sufficiently accompanied by cautionary language by reference, if not more. It is also worth noting that it is the opinion of this Court that a number of the oral statements that Plaintiff claimed were misrepresentations were accompanied by adequate, contemporaneous, cautionary utterances from Defendants, without having to resort to the press releases' warning: "[W]e've got to wait and see."; "[T]here remains a lot of uncertainty in this environment."; "[T]here are a lot of variables in the equation."; "[I]n the current environment, particularly as it relates to North America, there is less new build activity."; "And the, and then the other piece, of course, it was cost. . . . [I]t was a tough period for us."; "[T]he big part of enterprise this year is really softness in North America[.] . . . [T]here is no doubt that our international part of the business is performing at top line, much better than North America."; ". . . North America has not continued to respond favorably." (Doc. 29-10 at 4, 8.)

The issue, then, becomes which of Plaintiff's identified statements from the conference call are forward-looking. The Court finds a number of the statements to be forward-looking and thus insulated from liability because they are accompanied by meaningful cautionary language, pursuant to section 78u-5(c)(1)(A)(i). These include the following statements identified by the Plaintiff: "[I]t's going to push us towards the top side of the existing *guidance*, and we'll have a *chance at the end of the Q to recalibrate* that whole process."; "[T]here's nothing we saw in the first quarter that would substantially change our *outlook*."; ". . . [T]he *outlook* for the rest of the year looks consistent."; "[W]e *expect* ongoing data center strength . . . ."; "The impact in the enterprise market and digital broadband, I will say *largely won't be felt until the current quarter*."; "Clearly [the projected growth rate of Enterprise] would be single digit type numbers, something in the neighborhood of 5% in North America." (Doc. 26 at 28–33, 40–45) (emphases removed). All of the preceding statements just identified contain "statement[s] of future economic performance" and are thus forward-looking pursuant to section 78u-5(i)(1)(C), and are thus not actionable under the PSLRA.

   *(c) CommScope's 10-Q SEC filing for the first quarter of 2008.*

   Plaintiff also alleges that a number of statements in the company's SEC quarterly filings contain false or misleading statements. (Doc. 26 at 33–34, 45–46.) The SEC reports contain similar, if not more detailed, cautionary language as that provided by Defendants in their press releases. *See* discussion *supra* Part III.B(i)(a); (*see also* Doc. 29-10 at 5, 11). As such, this Court finds that all forward-looking statements in the company's challenged SEC 10-Q Forms are accompanied by meaningful cautionary language and are thus insulated from liability under the PSLRA. *See* discussion *supra* Part III.B(i)(a).

Thus, once again, the remaining issue is which, if any, of the statements identified as false or misleading by the Plaintiff in the relevant SEC forms are forward looking. It is this Court's opinion that a number of such statements are forward-looking: "These price increases *are expected* to provide limited benefit to gross profit *in the second quarter, but more significant benefits in the second half of the year*."; "We *expect* demand for Enterprise products . . . ."; "These price increases . . . are *expected to provide more significant benefits in the second half of the year*." (Doc. 29-10 at 6, 12) (emphases removed). As such, the foregoing statements are forward-looking statements accompanied by meaningful cautionary language and are thus protected from liability under the PSLRA.

B. Non-Forward-Looking Statements

Plaintiff has identified other statements that it claims are false and misleading that are not forward-looking statements. They are, instead, "statements of present or historical fact [that] do not [fall within the statutory safe harbor]." *In re Smith & Wesson Holding Corp. Sec. Litig.*, 604 F. Supp. 2d 332, 341 (D. Mass. 2009). For such statements to survive a motion to dismiss, Plaintiff must plead facts with particularity that support a plausible claim upon which relief can be granted, consistent with the Supreme Court's heightened pleading standard as set out in *Tellabs*. *See Tellabs*, 551 U.S. at 323. In turn, to successfully plead securities fraud under section 10(b), a plaintiff must adequately allege the following: (1) a false statement or omission of material fact in connection with the purchase or sale of a security was made; (2) the defendant made the statement with scienter of the falsity; (3) the plaintiff justifiably relied on the false statement; and (4) the false statement was the proximate cause of the financial injury suffered by the plaintiff. *Teacher's Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 172–73 (4th Cir. 2007); *see also* 15 U.S.C. § 78u-4(b); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

Unlike the Reform Act's safe harbor, this rule is conjunctive. As such, Plaintiff must satisfy each and every element. If any of the elements are not proven or pleaded with particularity, the claim must fail as a matter of law. *See Katyle v. Penn. Nat. Gaming, Inc.*, 637 F.3d 462, 472 (4th Cir. 2011). For the following reasons, this Court finds that Plaintiff has failed to plead facts sufficient to satisfy even the first element of falsity, and therefore the latter elements need not be considered. Accordingly, the entire claim fails.

First, the Plaintiff challenges the validity of the following statement: "Enterprise sales were essentially unchanged year-over-year, the Enterprise segment grew primarily due to sales growth in all other regions." (Doc. 26 at 28.) This particular statement was made in the company's First Quarter 2008 Results press release on April 29, 2008, precipitating the establishment of the class period. (*Id.*) The Court finds this statement to be neither false and misleading on its face, nor misleading by omission because it is simply reporting a fact—a fact which seems to be supported by the evidence and is unchallenged by the Plaintiff. CommScope's first-quarter results showed a 5.3% increase in year-over-year sales in the Enterprise segment; this information was confirmed in both the company's press release, as well as its official SEC 10-Q Form for the first quarter. (*Id.*; Doc. 29-13 at 17.) Plaintiff has alleged no facts to dispute that these numbers are accurate, nor is it the Court's understanding that they challenge the validity of the figures in any respect. Therefore, the recitation of a mere fact about the financial results of a company to its investors is not false and, taken independently, cannot be misleading.

Second, Plaintiff also alleges that the following statement is misleading: "As a result of higher raw material costs, price increases were announced on selected cable products in the ACCG, Enterprise and Broadband segments." (Doc. 26 at 28.) As above, the statement of a mere fact regarding the operations of a company, made to its investors, cannot be misleading in and of

itself. Plaintiff readily recognizes that price increases were made—"CommScope implemented pricing increases in April, June, and August 2008"; the company's mere disclosure of such strategic-pricing models is not misleading. (Doc. 26 at 20.)

Third, Plaintiff takes issue with a statement made by Defendant Leonhardt in an April 29, 2008, conference call with securities analysts: "Enterprise segment continues to experience profitable year-over-year growth, as businesses migrate towards our premium enterprise infrastructure solutions. Enterprise has continued to invest in higher bandwidth solutions, as employees work more collaboratively, data centers expand, legacy security networks migrate to IP base platforms, and buildings are configured with intelligent infrastructure." (Doc. 26 at 29.) In alleging that this is a misleading statement, Plaintiff relies, in part, on *In re Constellation Energy Group, Inc.*, for support of their conclusion that the "***current*** state of CommScope's . . . Enterprise sales performance . . . do not fall within the PSLRA's safe harbor." (Doc. 29); *see In re Constellation Energy Grp, Inc.*, 738 F. Supp. 2d 614, 626 (D. Md. 2010) ("[I]t cannot be said as a matter of law that the inaccurate downgrade collateral estimates were forward-looking . . . .").This case, however, proves only that an inaccurate statement is misleading, not an accurate one. Here, and unlike the case of *In re Constellation Energy*, the statement in question is one of accurate fact: at the end of the first quarter of 2008 the Enterprise segment was still empirically "experience[ing] profitable year-over-year growth." (*See* Doc. 29-13 at 17) (SEC filing). The company's speculations as to why Enterprise continued to grow in the first quarter are not challenged, and, even it if they were, no facts are proffered to claim that the speculations were inaccurate. (Doc. 26 at 29); (*see generally* Doc. 29-13) (providing a breakdown of the segmented performance numbers in the company's official SEC filings). Thus, an accurate statement of historical fact, once again, cannot be false or misleading on its own.

During the same conference call with analysts, Defendant Garrett responded to a question about "being a little more cautious" in the full year's outlook with the following statement that is considered by the Plaintiff to be misleading: "You know, that being said, in the enterprise space, you know, we talk about our pipeline and the visibility we have. There is nothing there that concerns us. There is an attractive rate of new projects coming into that pipeline that give us a lot of confidence." (Doc. 26 at 31–32.) Setting aside that this question was in response to the company's outlook, and could thus fairly be construed as forward-looking, the Court recognizes that "descriptions of the present aren't forward looking." *Berson v. Applied Signal Tech, Inc.*, 527 F.3d 982, 990 (9th Cir. 2008). The "rate of new projects coming into the pipeline" could be fairly read as a "description of the present," especially when drawing "all reasonable inferences in favor of the plaintiff" on this Motion to Dismiss. (Doc. 26 at 31-32); *Berson*, 527 F.3d at 990; *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). Therefore, the Court will consider the statement as a non-forward-looking one.

Specifically, Plaintiff asserts that this statement is misleading and false because "CommScope was then-experiencing reductions in its sales pipeline in the Enterprise segment" and "knew demand for its Enterprise products was declining." (Doc. 26 at 37.) To carry a motion to dismiss under the heightened pleading standards, Plaintiff must "specify . . . the reasons why the statement is misleading . . . [and also] state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1)(B), (2)(A). This the Plaintiff does not do. Instead, the Plaintiff relies on confidential witness testimony about internal sales budgets (Doc. 26 at 14–17), confidential testimony of "big" dropped projects in the North American Enterprise group (*id.* at 17–19), and confidential

testimony relating speculative hearsay from anonymous customers who were "looking elsewhere" for similar products (*id.* at 21).

A company's *internal* sales budgets and forecasts, however, are not relevant to what is reported to outside investors. A company may presumably set internally unattainable sales goals for any number of other reasons, including motivating its sales representatives to strive for those numbers. Nowhere, however, does Plaintiff assert any facts that tend to establish that Defendant used these internal sales forecasts in the figures, predictions, or statements made to investors. Instead, in the particular statement being evaluated here, Defendant only said that "there is an attractive rate of new projects" and that they had "confidence." (Doc. 26 at 31–32.) It is entirely possible that if Defendant were setting unattainable goals for aggressive growth as alleged by the Plaintiff—"Across the board, the North American Enterprise group was tasked with attaining sales growth of 15 to 24 percent above the actual 2007 sales for 2008"—failure to meet those lofty goals would still result in growth. (Doc. 26 at 14.)

Plaintiff also alleges that sales were slowing down and that the pipeline was shrinking. (Doc. 26 at 37.) The facts provided, however, are sparse and limited to a few "big" dropped projects in North America. (*See* Doc. 26 at 15–18) ("Amgen spent nearly $5 million with CommScope in 2007, but within the first two months of 2008, it was evident that Amgen would not be spending even 'a million dollars' with the company in 2008."). However, as stated within the Amended Complaint itself, Defendant recognized publicly that "the number of *big projects*, projects that are bigger than $5 million, or $10 million, contrasted to prior years, is probably down. But with this large sales organization, *globally positioned*, what it means is, they are picking up *larger numbers of smaller projects*." (Doc. 26 at 43) (emphases added). Because Defendant gave, in a different conference call, a plausible and unprompted explanation for why

its statement that the *rate* of new pipeline projects was "attractive"—"picking up larger numbers of smaller projects"—and because Plaintiff provides no general, must less particularized, factual allegations why this may be untrue, the Court finds unpersuasive Plaintiff's particular facts offered in support of an inference of scienter, much less evidence to suggest the statement was false in the first place. *Id.* Therefore, this statement, by itself and according to the heightened pleading standards, is neither false nor misleading.

Yet another statement challenged by Plaintiff in the conference call is the declaration by Defendant Drendel that "[w]e [CommScope] are executing well, gaining some market share, but obviously our competitors are having problems." (Doc. 26 at 32–33.) First, it is unclear what exactly in that statement Plaintiff challenges, as after a laundry list of statements peppered with bold, italic font, Plaintiff merely claims all of the identified statements are misleading or false because of the previously established confidential testimony relating pipeline problems, sales slowdowns, customer unrest, et cetera. (Doc. 26 at 37.) Plaintiff, however, offers no factual data to show the company's performance in comparison to its competitors. Without this data, or facts at least addressing the general success of CommScope's competitors, there is no possible way to ascertain whether CommScope's claim of gaining market share is false or misleading. In the midst of what was recognized by both parties as an exceedingly difficult time in America's economic history, even if CommScope lost sales, it could continue to gain market share if its competitors lost more sales. Because no facts are alleged that in any way touch upon the status of CommScope's market share, Plaintiff has failed to plead facts with sufficient particularity to suggest a plausible finding of falsity in regard to this statement.

Next, Plaintiff identifies a series of non-forward looking statements made by Defendants during the course of the July 29, 2008, conference call as misleading or false. (Doc. 26 at 41–45.)

The majority of the statements had to do with Enterprise performance: "Despite a challenging North American market and tough year-over-year comparisons, due to an exceptionally [sic] year ago quarter, we delivered solid enterprise results."; "[W]e're pretty well pleased with the response that we have gotten [to Enterprise price increases]."; ". . . [Enterprise] is not slowing down." (Doc. 26 at 41–46) (emphases removed). Plaintiff opines that the statements are misleading or false because "CommScope was then experiencing a dramatic sales slowdown in its Enterprise segment." (Doc. 26 at 47.) A close examination of the pleadings, however, shows that Plaintiff only gathered factual allegations to support an inference that *North American* sales were slowing down. (*See* Doc. 26 at 11–20.) CommScope acknowledged repeatedly that this is, in fact, true: "[T]he part that is disappointing is North America . . . ."; ". . . in light of what looks like adversity, in the North American market."; ". . . North America has been softer than my expectations."; "[T]here is no doubt that our international part of the business is performing at top line, much better than North America." (Doc. 26 at 44–46.)

Simply put, Plaintiff cannot support a claim that all of Enterprise was slowing down when it has provided particular facts relating only to the North American segment—especially when Defendant explicitly informed its investors that the North American segment was struggling. Because Defendant readily admitted to that fact, it is "at least as compelling as [the] opposing inference," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007), that the *international* portion of the Enterprise was carrying the segment's alleged success: "Operating income in quarter grew 14% sequentially, *supported by double digit international sales growth* . . . " (Doc. 26 at 40). Because an opposing inference, coupled with compelling evidence, suggests that Defendants' statements were not false or misleading, this Court finds that

Plaintiff has not carried its burden of alleging facts with particularity adequate to state a claim upon which relief can be granted in this context.

The Court holds that Plaintiff has failed to plead facts with particularity to support a claim for securities fraud as it applies to the falsity of any non-forward-looking statements identified in the Amended Complaint. Because the Court so holds, there is no need to continue to an analysis of a strong inference of scienter or causality of loss. All aspects of the Amended Complaint that necessarily rely on identified statements that are non-forward-looking, therefore, are to be dismissed.

C.  Section 20(a) Claim

Plaintiff's section 20(a) claim must also fail. Section 20(a) of the Exchange Act provides the following:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or(3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

Securities Exchange Act of 1934 § 20(a), 48 Stat. 891 (codified as amended at 15 U.S.C. § 78t(a)). Plaintiff alleges that the individual defendants must be liable for all claims against the company they controlled. Defendants readily admit that the individual defendants were "controlling persons" of CommScope but assert that if the section 10(b) claims fail, so too must the section 20(a) claim. The Court agrees. *See In re Visual Networks, Inc. Sec. Litig.*, 217 F. Supp. 2d 662, 670 (D. Md. 2002) ("Plaintiffs' failure to state a claim for a primary securities fraud violation precludes a finding of control person liability.").

This Court has determined that Plaintiff's section 10(b) claims fail the rigorous pleading standards supplied by the PSLRA, *see* discussion *supra* Part III.B–C, and therefore must also dismiss its section 20(a) claim.

## IV. CONCLUSION

In sum, (1) Defendants may not assert an affirmative defense predicated upon a SEC Rule 10b5-1 on a motion to dismiss, (2) all forward-looking statements made by Defendants and identified as false and misleading by Plaintiff were accompanied by meaningful cautionary language, (3) all non-forward-looking statements made by Defendants and identified as false and misleading by Plaintiff were not supported by facts pleaded with particularity to support a claim of falsity, and (4) Plaintiff cannot carry a section 20(a) claim without a well-pleaded section 10(b) claim. **IT IS, THEREFORE, ORDERED** that Defendants' Motion to Dismiss (Doc. 29) be **GRANTED**.

Signed: August 6, 2013

Richard L. Voorhees
United States District Judge